IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
IN OPEN COURT

SEP 24 2021

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LEONARD ROSEN,<br><br>Defendant. | Criminal No. 1:21-cr-205<br><br>Count 1: Health Care Fraud<br>(18 U.S.C. § 1347) |

## STATEMENT OF FACTS

The United States and the defendant, LEONARD ROSEN ("ROSEN"), stipulate that the allegations in the Criminal Information and the following facts are true and correct. The parties further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

**I.     Introduction**

1.     ROSEN is an obstetrician-gynecologist ("ob-gyn") who has practiced in Northern Virginia since 1980. From at least in and around January 2014 to in and around February 2017, ROSEN owned and operated a medical practice called FAIRFAX OB-GYN ASSOCIATES ("FAIRFAX OB-GYN"). In and around February 2018, ROSEN sold FAIRFAX OB-GYN; however, he continued to practice there after selling the business. In and around October 2019, ROSEN left FAIRFAX OB-GYN and started working at another medical practice. Both medical practices are located in the Eastern District of Virginia.

2.     Since in and around May 2008, MOHAMED ABDALLA ("ABDALLA") has been a licensed pharmacist in the Commonwealth of Virginia. ABDALLA owned and operated MEDEX HEALTH PHARMACY ("MEDEX HEALTH"), which was located in Falls Church,

Virginia, and ROYAL CARE PHARMACY ("ROYAL CARE"), which was located in Fairfax, Virginia, and both were located within the Eastern District of Virginia. ABDALLA also operated several other pharmacies in the area. ROYAL CARE filled prescriptions prescribed by numerous doctors and billed various health insurance benefit programs.

3. Since March 1998, NURSE PRACTITIONER 1 has been a certified nurse midwife. From at least in and around January 2014 to in and around December 2019, NURSE PRACTITIONER 1 worked at FAIRFAX OB-GYN.

4. From in and around 2012 until in and around November 2015, DOCTOR 1 worked as an ob-gyn at FAIRFAX OB-GYN. In and around November 2015, DOCTOR 1 left FAIRFAX OB-GYN and started MEDICAL PRACTICE 1. DOCTOR 2 left FAIRFAX OB-GYN to join MEDICAL PRACTICE 1 at the same time as DOCTOR 1. DOCTOR 1 also owned a pain clinic and DOCTOR 2 worked there as well.

## II. Conduct Constituting Health Care Fraud

5. From a date unknown, but by at least in and around November 2014 and continuing to at least in and around October 2018, in the Eastern District of Virginia and elsewhere, ROSEN knowingly and willfully did execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), including but not limited to Anthem BlueCross BlueShield, CareFirst BlueCross BlueShield, Aetna, and United Healthcare to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, all in violation of Title 18, United States Code, Section 1347.

*a. Receiving Kickbacks for Compounded Prescriptions Sent to MEDEX HEALTH and ROYAL CARE and Prescribing Medications that Were Not Medically Necessary*

6. During the relevant period, DOCTOR 1 approached ABDALLA about facilitating a financial arrangement with FAIRFAX OB-GYN. DOCTOR 1 indicated that ABDALLA could fill all the prescriptions from FAIRFAX OB-GYN if ABDALLA paid ROSEN for the prescriptions sent from the practice. DOCTOR 1 introduced ABDALLA to ROSEN. Initially, ROSEN was told that the compensation he would receive was for participating in a "speaker bureau" for ABDALLA, but ROSEN quickly learned that this was not the case. Instead, the arrangement was for ROSEN to send his prescriptions to ABDALLA's pharmacies in return for financial kickbacks.

7. The initial arrangement, which DOCTOR 1 facilitated, was for ABDALLA to pay ROSEN $100 per prescription sent to ABDALLA's pharmacies from FAIRFAX OB-GYN. Later, ROSEN and ABDALLA agreed that ROSEN would be paid $5,000 per month, with an understanding that there would be a reconciliation at the end of the year. The prescriptions sent from FAIRFAX OB-GYN to ABDALLA mostly included prescriptions listing NURSE PRACTITIONER 1 as the prescriber; however, ROSEN, DOCTOR 1, and DOCTOR 2 also wrote prescriptions. The prescriptions ranged from compounded medications to prescriptions for DermacinRX, Duexis, Fluocinonide, Flurbiprofen, Ortho D, Pennsaid, and Vimovo, among others.

8. Prior to the kickback arrangement with ABDALLA, ROSEN's practice did not prescribe compounded scar creams for every surgical patient, and ROSEN was aware that patients could purchase over-the-counter medications such as 1% hydrocortisone to prevent scars. After ROSEN entered into the kickback agreement with ABDALLA, ROSEN instructed

3

all providers at FAIRFAX OB-GYN that every patient who received a surgery at the practice was to receive a prescription for a compounded scar cream. ROSEN did not assess the medical necessity of the compounded scar creams for each patient and he knew that some of patients did not need the creams.

9. With NURSE PRACTITIONER 1's concurrence, ROSEN made the decision that NURSE PRACTITIONER 1, as the surgical first assistant at FAIRFAX OB-GYN, would sign as the prescriber for all these compounded scar cream prescriptions, regardless of the treating provider. A ROYAL CARE employee provided a prescription pad listing specific drugs and compounds. NURSE PRACTITIONER 1 signed blank pages of the pad in advance. Having the prescriptions pre-signed ensured there was not a delay in sending the prescriptions to the pharmacy.

10. ROSEN knew that compounded scar creams are to be individualized for each patient and that there were various ingredients physicians could prescribe to be included in the creams. ROSEN did not individualize the compounded prescriptions for the patients despite knowing that the purpose of a compounded prescription was for it to be individualized for each patient.

11. ROSEN further knew that it was wrong to receive money in exchange for sending prescriptions to a pharmacy. He knew that his arrangement violated his contracts with insurers, including Anthem BlueCross/BlueShield ("Anthem") and CareFirst BlueCross/BlueShield ("CareFirst"). For example, the contract between Anthem and FAIRFAX OB-GYN reads: "Provider represents and warrants that Provider does not give, provide, condone, or receive any incentives or kickbacks, monetary or otherwise, in exchange for the referral of a Member, and if a Claim for payment is attributable to an instance in which Provider provided or received an

incentive or kickback in exchange for the referral, such Claim shall not be payable and, if paid in error, shall be refunded to Anthem." Further, the contract between CareFirst and FAIRFAX OB-GYN reads: "Group agrees not to accept any compensation in return for referring any Member to a provider for the furnishing of any item or service payable by Corporation. Group also agrees to refer Members to providers in accordance with applicable state law and the laws and regulations of the Medicare program."

12. As part of the arrangement, ABDALLA paid ROSEN approximately $100,000. At the beginning of the financial arrangement, ABDALLA paid ROSEN with checks totaling $12,700 from MEDEX HEALTH GROUP. After February 2015, ROSEN asked ABDALLA to pay him in cash to help conceal the kickback arrangement. Between March 2015 and September 2017, ABDALLA caused ROSEN to be paid approximately $85,000 in cash. Then, in August 2018, ABDALLA caused ROSEN to be paid $3,000 in cash.

13. The health care benefit programs paid $2,212,442 for compounded prescriptions that were prescribed by ROSEN and NURSE PRACTITIONER 1 and issued within 60 days of an office visit at FAIRFAX OB-GYN. After ROSEN and ABDALLA entered into their arrangement, ROSEN did not assess the medical necessity for these compounded creams before prescribing or directing the prescribing of the compounded creams to each patient. Instead, FAIRFAX OB-GYN providers prescribed these creams at ROSEN's direction, a direction he gave because he was motivated by his kickback arrangement with ABDALLA. As a result, only 15% of the compounded creams prescribed were medically necessary. Thus, the kickback arrangement resulted in the health care benefit programs paying $1,880,575.70 to ABDALLA's pharmacies for compounded creams that were medically unnecessary.

14. In addition to compounded scar creams, FAIRFAX OB-GYN also sent MEDEX

5

HEALTH and ROYAL CARE prescriptions for metabolic capsule compounds containing red Alaskan algae powder, which was a very expensive ingredient. At one point during the arrangement, someone from ROYAL CARE brought ROSEN letters to sign. The letters were sent to EXPRESS SCRIPTS ("ESI"), a pharmacy benefit manager ("PBM"), because ROYAL CARE was having problems obtaining payment for some prescriptions. PBMs are companies that manage prescription drug benefits on behalf of health insurers, Medicare Part D drug plans, large employers, and other payers. The letters confirmed that FAIRFAX OB-GYN providers wrote certain prescriptions for specific patients, including the metabolic capsules containing the red Alaskan algae powder. The letters included ROSEN and NURSE PRACTITIONER 1's name. ROSEN neither wrote nor read the letters; however, he signed the letters to help the pharmacy obtain compensation for the prescriptions. ROSEN was not aware of what the red Alaskan algae metabolic capsule compounds were used for at the time he signed the letters or gave permission for his signature stamp to be used. Therefore, these prescriptions were medically unnecessary.

15. On or about August 16, 2018, in Fairfax County, Virginia, within the Eastern District of Virginia, ROSEN met with a pharmacist who was then working at the direction of law enforcement. During this meeting, ROSEN accepted a $3,000 kickback payment for ROSEN referring prescriptions to a pharmacy controlled and operated by the cooperating pharmacist.

      b. *Prescriptions Improperly Billed as an Out-Of-Network Provider*

16. In 2000, ROSEN started a company called LAR M.D. P.C. to facilitate out-of-network billing with health insurance benefit programs. Physicians can have arrangements with health insurance benefit programs to bill services as in-network providers or out-of-network providers. In-network providers receive less compensation for their services, but typically

6

receive a higher volume of patients because patients actively seek providers who have in-network status with their health insurance benefits programs. Out-of-network providers receive more compensation for their services, but typically fewer patients use their services because the patients are responsible for higher out-of-pocket costs.

17.     From September 2012 through May 2019, ROSEN billed for services provided to patients under his out-of-network company LAR M.D. P.C., even though these patients had insurance from health benefit programs that were in-network with ROSEN and FAIRFAX OB-GYN. ROSEN did this because he wanted to receive the out-of-network rate for these services. ROSEN knew that he should have billed these services through FAIRFAX OB-GYN as an in-network provider. In these instances, ROSEN also improperly waived the patient co-payment/deductible amounts. If ROSEN did not get paid as an out-of-network provider, he would then re-bill these services as an in-network provider through FAIRFAX OB-GYN.

18.     During the relevant period, LAR M.D. P.C. billed $1,206,951 as an out-of-network provider, and health benefit programs paid $205,095. As a result of this scheme, a major insurance company suffered losses in the amount of $52,839.

19.     During this period, DOCTOR 1 asked ROSEN how to set up a separate entity to bill out-of-network services so that DOCTOR 1 could get paid more money. ROSEN provided DOCTOR 1 with advice on how to set up such an entity. DOCTOR 1 also set up a separate company, COMPANY 1, to bill out-of-network services.

### III.    Conclusion

20.     The acts described above were done willfully and knowingly and with specific intent to violate the law, and not by accident, mistake, inadvertence, or other reason.

21.     This Statement of Facts does not contain each and every fact known to ROSEN

7

and to the United States concerning ROSEN's involvement in the charges set forth in the plea agreement.

22. This Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against ROSEN regardless of whether the plea agreement is presented to or accepted by the Court. Moreover, ROSEN waives any rights that he may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 401, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

Monika Moore
Carina A. Cuellar
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, LEONARD ROSEN, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
LEONARD ROSEN

I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Stuart Sears, Esq.
Christopher Mead, Esq.
Attorneys for LEONARD ROSEN