## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 1:21CR00205** |
| **v.** | ) | |
| | ) | **The Honorable Claude M. Hilton** |
| **LEONARD ROSEN,** | ) | |
| | ) | **Sentencing Hearing: March 18, 2022** |
| **Defendant.** | ) | |

### DEFENDANT'S POSITION ON SENTENCING

Dr. Leonard Rosen stands before the court for sentencing as a 72-year-old first time felon with no criminal history.  As the Court is aware, Dr. Rosen entered a guilty plea to one count of health care fraud in violation of 18 U.S.C. §1347, a Class C Felony. Dr. Rosen accepts full responsibility and is deeply remorseful for his criminal conduct. This crime, however, should not overshadow his lifetime of good deeds as an obstetrician-gynecologist ("ob-gyn") and as a father, husband, and community member. Over the last four decades, Dr. Rosen delivered over 10,000 babies and touched the lives of countless families. He has dedicated his entire career to making medical procedures safer, less expensive, and less invasive for women. He has been equally devoted to supporting his wife and two of his adult daughters as they continue to confront serious medical challenges. Dr. Rosen is committed to righting his wrongs and will make full restitution, *far in excess of any improper gains he received*, at sentencing. Dr. Rosen has already suffered substantial consequences as a result of his conduct, including the impending loss of his medical license.

As provided in the Presentence Investigation Report ("PSR"), Dr. Rosen's acceptance of responsibility has been swift and absolute and he has been fully cooperative with the government's ongoing investigation into his conduct and that of others. Dr. Rosen respectfully asks this Court to

1

fashion a sentence that will adequately account for the serious nature of his crimes but that also recognizes the true impact any incarceration will have on his health and family. The government has submitted its position that a sentence of 20 months is appropriate but deferred to the Court on whether any additional departure is warranted based on the specific circumstances related to Dr. Rosen's age, medical condition, and family situation. *See* Dkt. 17 at 2, 8. For the reasons set forth herein, we respectfully submit that consideration of those circumstances supports a finding that a sentence of probation with a period of home confinement is sufficient, but not greater than necessary, to achieve the purposes of federal sentencing in this case.

## I.       THE BASELINE ADVISORY SENTENCING GUIDELINES RANGE

The statutory maximum punishment for Dr. Rosen's offense is imprisonment for up to 10 years; a fine the greater of $250,000 or twice the grow gain or loss, full restitution, forfeiture of assets, a $100 special assessment, and 3 years of supervised release.  *See* PSR at 1.  As reflected in the PSR, the United States Probation Office has determined that, under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), Dr. Rosen has an Offense Level of 21 and a Criminal History Category of I, which together result in an advisory Sentencing Guidelines range of 37 to 46 months of incarceration.

Since the entry of the plea agreement, the government and Dr. Rosen have determined that the appropriate loss amount is actually below $1,500,000. For that reason, both the government and Dr. Rosen ask the Court, and the probation office, to decrease his Offense Level from 21 to 19, because the loss amount no longer exceeds $1,500,000.  *See* Dkt. 17 at 1.  An Offense Level of 19 results in an advisory Sentencing Guidelines range of 30 to 37 months of incarceration.

Calculating the baseline advisory Guidelines range is merely the first step in the federal sentencing process.  *See Gall v. United States*, 552 U.S. 38 (2007).  After calculating the baseline

Guidelines range, the Court must determine whether to apply any Guidelines-based departures to adjust the applicable Guidelines range. *Id.* Once the final advisory Guidelines range is determined, the Court then must consider the factors set forth in 18 U.S.C. § 3553(a) and decide whether a variance from the Guidelines is warranted based on the circumstances and features of the case and the defendant before it. *Id.*

## II.      18 U.S.C. § 3553(A) FACTORS

In the post-*Booker* era, the sentencing court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in the statute. Pursuant to the statute, the sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553 requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s). 18 U.S.C. § 3553(a)(1)-(7).

Under § 3553, the advisory Guideline range receives no presumption of reasonableness, nor does any presumption of unreasonableness attach to a sentence that varies from the Guideline range. *See Gall*, 522 U.S. at 50; *see also id.* at 52 ("It has been uniform and constant in the federal

3

judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)). In the instant case, we submit that the requested sentence is appropriate after consideration of all of the § 3553(a) sentencing factors.

### A.  The Nature and Circumstances of the Offense

The nature and circumstances of Dr. Rosen's offense are largely addressed in the statement of facts included as part of his plea agreement and in the offense conduct portion of the PSR. Therefore, Dr. Rosen provides the following only to supplement the record already before the Court.

Dr. Rosen is an ob-gyn who has practiced in Northern Virginia for over 40 years. He opened Fairfax OB-GYN Associates in 1980 and over the past 4 decades has delivered over 10,000 babies in the Eastern District of Virginia and has performed thousands of surgeries on women in the Northern Virginia community. He earned a reputation for being an honest and caring physician who was only ever motivated by patient care.  Unfortunately, Dr. Rosen's more recent conduct, which occurred towards the end of a long and distinguished career, now overshadows the good he has done and the way he lived and practiced before being introduced to Mohamed Abdalla.

While Dr. Rosen did not invent or propose the kickback arrangement, he knowingly agreed to it against his better judgment. He did not need the money and was not motivated by greed, as evidenced by the fact he kept the payments at home and never spent any of the proceeds.  Indeed, he returned the money to the government shortly after his first contact with law enforcement.

Throughout the existence of the arrangement, Dr. Rosen was paid approximately $100,000 in kickbacks, while Mr. Abdalla and Doctor 1 split the vast majority of the improper gains, which

involved several millions of dollars. In fact, Mr. Abdalla and Doctor 1 concealed their far more lucrative financial arrangement[1] from Dr. Rosen and, unbeknownst to Dr. Rosen, Mr. Abdalla and other doctors at the practice wrote and filled hundreds of additional medically unnecessary prescriptions, many of which Dr. Rosen had never even heard of.  It was not until this case that Dr. Rosen learned the true extent of their conduct.

Importantly, however, the Court should consider that Dr. Rosen never put any patients at risk.  Rather, for a percentage of patients, he prescribed a stronger medication than they needed to heal their surgical wounds. He did so for an improper purpose and it caused an unnecessary cost to the insurance providers.  But as noted, through his full payment of restitution at sentencing, Dr. Rosen will have made those insurers whole. That fact favorably distinguishes him from his co-defendant and the other doctors who joined the conspiracy but who have refused to accept responsibility and have not yet been charged.  Dr. Rosen's immediate and complete acceptance of responsibility and the manner in which he has ensured that he has repaid the financial harm he caused supports a sentence of home confinement.

### B.  History and Characteristics of the Defendant

Dr. Rosen's personal history and characteristics support a sentence well below the proposed adjusted Guidelines range. Dr. Rosen's lifetime of good deeds, the vital caretaking role he provides for his wife and two of his adult daughters, and his own age and health all support a sentence of home confinement.

---

[1] *See* Statement of Facts, *United States v. Abdalla*, Case No. 1:20-cr-250-CMH (Dkt. 8) at 14 (detailing how Doctor 1 was paid 40% of the proceeds and received payments from Mr. Abdalla in excess of $2,400,000 between 2014 and 2016).

*i.*    *Dr. Rosen's career as an ob-gyn*

Dr. Rosen has had a truly remarkable career as an ob-gyn. Dr. Rosen was certified by the American Board of Obstetrics & Gynecology (ABOG) in 1982 and is a Fellow of the American College of Surgeons. While in medical school, Dr. Rosen was awarded the Kane King Obstetrical award for best resident. Throughout his over 40-year career, Dr. Rosen has benefited the lives of thousands of local families. As a testament to how Dr. Rosen touched the lives of his patients, several have written to this Court to urge leniency.

As an ob-gyn, Dr. Rosen was at the forefront of his profession for developing minimally invasive and robotic assisted procedures. These advancements made surgery less expensive and invasive for his patients, decreased the amount of time patients spent in the hospital, and lowered costs for insurance carriers. He also spearheaded the implementation of Enhanced Recovery After Surgery (ERAS) protocols at local hospitals, which is an improvement initiative that helps decrease length of stay, complications, and cost without increasing readmission.  Moreover, Dr. Rosen is one of the first physicians to receive a Center of Excellence in Minimally Invasive Gynecology (COEMIG) designation and he was instrumental in implementing robotic surgery at INOVA Fair Oaks Hospital where he achieved COEMIG status at the hospital.

Dr. Rosen also took steps on his own to combat the decades long opioid pandemic that has plagued this nation. Dr. Rosen broke from many of his peers, who were aggressively prescribing opioids, and instead prescribed pain creams to his surgical patients to avoid the addiction risks associated with opioids.

Dr. Rosen clearly cares deeply for his patients and his work. Throughout his career, Dr. Rosen was willing to treat patients in need for little to no pay and practiced with a bedside manner

that made an impact on his patients. According to Melissa Menendez, a former colleague and

patient of Dr. Rosen:

> I observed that he had a positive relationship with his patients – especially by his
> ability to listen and subsequently help. For these reasons, my mother and I also
> became Dr. Rosen's patients. Afterwards, there was an emergency situation in
> which my mother was seen by Dr. Rosen. At that time, my mother did not have
> insurance, so Dr. Rosen did not charge for any of the visits or consultations.
> However, my mother needed surgery. Dr. Rosen was concerned about my mother's
> health and offered to do the surgery at no cost to him – other than paying hospital
> fees, anesthesiology, and medications. For financial reasons, we did not go forward
> with the offer. Nevertheless, Dr. Rosen's compassion and generosity meant a lot to
> my mother and I. It is this kind of act that, in my opinion, makes Dr. Rosen an
> amazing person.

*See* Attachment 1 (Letters).[2]

Former Fairfax OB-GYN Associates nurse practitioner, Leah Elk, writes to the Court that

Dr. Rosen:

> …believes that all women, no matter race, ethnicity, socioeconomic status, should
> receive excellent healthcare. Many times I observed him provide free health care to
> women who had either no health insurance or financial means to pay for the visit
> or treatment that they needed. For example, I watched him perform an in-office
> vaginal Bartholin's gland cyst incision and drainage procedure for a woman who
> spoke minimal English plus she had no health insurance and was unable to pay for
> healthcare. He saw the same patient multiple times in his office, and he never
> charged her for his services. The patient was so grateful.

*See id.*

Ellen Weiss, who has been a patient of Dr. Rosen for 22 years, calls him her "guardian

angel" and describes how grateful she is "to have found a physician who personifies the highest

standards of medical care as well as profound levels of decency and humanity.  He is truly

irreplaceable and his absence will be an enormous loss for so many people."  *Id.*  And, as has been

---

[2] All of the letters submitted on behalf of Dr. Rosen have been consolidated as Attachment 1.
Though only a few letters are mentioned directly in this memorandum, the Court is invited to read
each of the letters that were submitted.

noted in several of the letters, Dr. Rosen's compassion and generosity has included two missionary trips to Bolivia at his own expense to use his medical expertise to help indigent people in the Bolivian community.

It is for these reasons that it is such a shame that Dr. Rosen's conviction will likely preclude him from continuing to serve his community as a doctor. He loved the practice of medicine and was nowhere near retirement. Unfortunately, his own lapses in judgment towards the end of an impactful career will force life-long patients to start new relationships with new doctors. For Dr. Rosen, that is among the most difficult and saddening consequences of his actions.

*ii.     Dr. Rosen's role as a caretaker at home*

Dr. Rosen has been equally involved in caring for his family and the medical challenges his wife and two daughters have had to endure. Dr. Rosen's wife of 46 years, Wendy Sirkin, and their three daughters – Stephanie Sinins, Allison Bathia, and Jacqueline Rosen – are the most important people in his life. And Dr. Rosen has been a stabilizing and calming force for his family throughout their years of hardship.

Section §5H1.6 of the Sentencing Guidelines recognizes the Court's discretion to depart from a guidelines sentence based on loss of caretaking or financial support. While we are asking the Court to consider the vital role Dr. Rosen provides in supporting his family as a variance under § 3553(a), we submit that the non-exhaustive list of circumstances the Court considers under §5H1.6 is relevant to the Court's consideration. Importantly, the Court's focus should be on the "effect of the defendant's absence on [his] family members." *United States v. Schroeder*, 536 U.S. 746, 756 (7th Cir. 2008) (citing *United States v. Johnson*, 964 F.2d 124, 129 (2nd Cir. 1992) ("The rationale for a downward departure here is not that [the defendant's] family circumstances decrease

her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing.")).

Regarding the general considerations listed in Application Note 1(A), we submit that while Dr. Rosen's crimes are serious, they are not of such a degree that they should preclude consideration of the impact of his absence on his family. None of Dr. Rosen's family members were involved in the carrying out of the offense and apart from the possibility of his prosecution and punishment, there was never any risk of danger to Dr. Rosen's family as a result of his role in the offense. Nor was there ever any risk to his patients.

As for those factors expressed in Application Note 1(B), we submit that a sentence of incarceration would "cause a substantial, direct, and specific loss of essential caretaking, or essential financial support" to Dr. Rosen's wife and family.

Stephanie Sinins, Dr. Rosen's oldest daughter, suffers from Familial Dysautonomia, a rare genetic disorder of the autonomic nervous system. The disease affects the development and survival of certain nerve cells. As a result of this disease, Stephanie is only approximately 4'8" tall and weighs 72 pounds. As his former medical school colleague, Dr. Robert Brauner, writes:

> This medical condition is exceedingly difficult to control and usually ends in death before 30 years of age. However, due to Lenny Rosen's diligence in overseeing Stephanie's care and taking her to consultations from experts in different parts of the country, Stephanie has made it through enumerable crises. In fact, she was able to get married and is now in her 40s. Stephanie is one of the oldest persons currently alive with her disorder, largely because of the persistence and medical care of her father.

*See* Attachment 1 (Letters).

Stephanie's disease had led to a series of other medical complications. Throughout her life, she has had severe swings in blood pressure, for which she has been hospitalized numerous times. Roughly ten years ago, Stephanie developed tongue cancer that required radiation therapy. As a

result, she currently suffers from osteonecrosis of the jaw, which has caused her to lose bone and teeth and left her unable to eat solid food. She currently uses a feeding tube. She has been recommended for Hyperbaric Oxygen Therapy to stimulate blood flow to the jaw for at least the next six months in order to ultimately permit her to receive dental implants. This new treatment will require daily trips to the treatment facility. Historically, Dr. Rosen and his wife have shared the responsibility of driving Stephanie to a wide range of medical appointments.[3] Because of the disease, Stephanie recently also had a knee replaced. She also suffers from hypertension and chronic kidney disease. Dr. Rosen supports Stephanie's countless medical appointments and pays for her and her husband's mortgage.

Jaqueline, or Jackie, Dr. Rosen's youngest daughter, suffers from a debilitating case of bipolar depression and is unable to live away from her parents. Dr. Rosen and his wife have and will continue to support her for the rest of their lives. Jackie has written to the Court to share how important her father is to her emotional wellbeing:

> I live with bipolar depression and my father oversees and interacts with my doctors. He is the one who helps to keep me calm and helps me with my bouts of depression. My father has apologized for the terrible mistake he made. Please be lenient, I am so scared he may not be available to help me. His medical expertise, as well as his caring nature, has made him my primary health caretaker, even to this day.

*See* Attachment 1 (Letters).

Jackie's counselor, Jessica Taylor, has also provided a letter wherein she provides additional detail about Jackie's condition and how it impacts her life. *See* Attachment 2 (Letter from Jessica Taylor – Redacted).  With regard to the role Jackie's parents play in her life, and specifically that of Dr. Rosen, Ms. Taylor writes:

---

[3] Due to Dr. Rosen wife's own medical complications described below, it is uncertain whether his wife will be able to handle this responsibility in the future.

The main factor in Jackie's stability (besides her attempts at self care) are in relation to the connection she has with her family and the emotional support that she receives from them. One of the setbacks that Jackie has to manage as a result of her mental health disorders is an inability to maintain employment or learn basic life skills. Her father, Leonard Rosen, has been instrumental in assisting Jackie develop independent living skills, to include employment and social skills. Mr. and Mrs. Rosen have been committed to ensuring that Jackie has ample opportunities to improve and to increase her functioning. Though I do not personally know Len, his personal values, family values, and compassion are evident and displayed through his daughter.

Jackie is also fully dependent upon her parents, lives at home and is also financially supported by her parents. *For the last several years, Jackie regularly takes daily walks with her father and he supports her in processing her difficulties, barriers to improving her functioning, and attempts to help her problem solve*. Although her psychiatrist prescribes and manages her medications, *her father is actively involved in her daily care and interactions*. Jackie has processed her fears and feelings about her father possibly not being present for a significant period of time. As such, and in accordance with the above stated information, *I have concern related to Jackie's emotional stability should her father be absent for an extended period of time*.

*Id*. (Emphasis added).

Finally, Dr. Rosen's wife Wendy is 70 years old, has hairy cell leukemia, and is a breast cancer survivor. Wendy was first diagnosed with breast cancer in 1990 and had a recurrence in 1995. To combat the cancer, she had to receive radiation treatment and a bilateral mastectomy. In 2011, Wendy was diagnosed with hairy cell leukemia, a rare slow-growing cancer of the blood. Until recently, doctors believed her cancer was in remission. However, recent blood tests have indicated a possible relapse. Doctors are closely monitoring her condition and, if there is a recurrence, she may require chemotherapy and/or a bone marrow transplant.

As shown, Dr. Rosen physically, emotionally, and financially supports his wife and daughters. We respectfully submit that the impact of Dr. Rosen's incarceration would wreak harm on his family and should strongly be considered as a basis for imposing a non-incarceration sentence.

###### iii.    *Dr. Rosen's age and health*

As provided in the PSR, Dr. Rosen is currently 72 years old. In addition to his advanced age, Dr. Rosen suffers from stage II chronic kidney disease, Type 2 diabetes mellitus, essential hypertension, hyperlipidemia (high cholesterol), nephrolithiasis (kidney stones), benign prostatic hyperplasia (prostate gland enlargement), and sleep apnea. Dr. Rosen is currently prescribed metformin for his diabetes, amlodipine for his blood pressure, and atorvastatin for his cholesterol. Dr. Rosen also takes the over-the-counter supplement coenzyme Q10 and multivitamins. Dr. Rosen has to use a continuous positive air pressure (CPAP) machine at night to control his sleep apnea.

Dr. Rosen's age and health conditions place him at increased risk of developing a serious illness if he were to contract COVID-19.[4] And, it is fair to assume that Dr. Rosen's chance of contracting the coronavirus will increase if he is in the custody of the Bureau of Prison ("BOP"). Indeed, the BOP's problematic handling of the coronavirus has been widely documented. The Court should consider the ongoing pandemic and the unnecessary risk incarceration would have on Dr. Rosen's health when considering an appropriate sentence.

Additionally, the Court should consider both the increased cost of incarcerating an individual of Dr. Rosen's age and health as well as the Bureau of Prisons' apparent inability to provide proper care to aging inmates.  The Department of Justice itself has reported that aging inmates (classified as age 50 or older) are substantially more costly to incarcerate than younger inmates:

---

[4] *See* Centers for Disease Control and Prevention, People with Certain Medical Conditions (August 14, 2020) *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions.

> We found that this cost differential is driven by increased medical needs, including the cost of medication, for aging inmates. BOP institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care ($10,114) than I institutions with the lowest percentage of aging inmates ($1,916). BOP institutions with the highest percentages of aging inmates also spent 14 times more per inmate on medication ($684) than institutions with the lowest percentage ($49).

*See* Department of Justice, Office of the Inspector General, Report on the Impact of an Aging Inmate Population on the Federal Bureau of Prisons, at ii (May 2015).

In addition to its cost findings, the investigation also revealed that the BOP (1) does not have the appropriate level of staff to meet the needs of its aging population, (2) is not physically equipped to house elderly inmates, and (3) does not provide adequate programming opportunities for aging inmates. Moreover, the report concluded that aging inmates commit far less misconduct, have lower risks of recidivism and that, if not for BOP policy limitations, would be viable candidates for early release from prison. *See id*. at i-iii. The government will bear a higher cost and burden to incarcerate Dr. Rosen, especially during a pandemic, and it appears from the Department of Justice's report that the increased costs still will not necessarily ensure that Dr. Rosen's needs will be met.

### iv.    *Dr. Rosen's sincere remorse and extraordinary restitution*

Dr. Rosen is sincerely remorseful for his conduct and the damage he has caused to everyone involved, and to his family. As evidence of his remorsefulness and acceptance of responsibility, Dr. Rosen has agreed to repay the full loss amount in this case at sentencing despite only personally benefiting a small fraction of that amount.

A defendant's extraordinary effort to make restitution is a valid basis for a downward departure under §5K2.0 of the Sentencing Guidelines. This is not a new or even a post-*Booker* development, as this ground for departure has long been approved by most Circuits when a

defendant's level of restitution exceeds that which ordinarily is recognized as acceptance of responsibility under Guidelines § 3E1.1.[5]  Indeed, federal judges overwhelmingly (75%) believe that restitution efforts are "ordinarily relevant" to departure/variance considerations.[6]  Among the

---

[5] *See United States v. Kim,* 364 F.3d 1235, 1240-41 (11th Cir. 2004):

> We now join the Second, Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits and hold that extraordinary restitution is not a prohibited factor. *See  United States v. Broderson,* 67 F.3d 452, 458–59 (2d Cir.1995) (affirming a district court's downward departure based in part on the defendant's restitution even though it could be justified "only as a 'discouraged departure'" given that, "[o]rdinarily, payment of restitution is not an appropriate basis for downward departure under Section 5K2.0 because it is adequately taken into account by Guidelines Section 3E1.1"); *United States v. Lieberman,* 971 F.2d 989, 996 (3d Cir. 1992) (affirming a district court's downward departure on the basis of the defendant's acceptance of responsibility as primarily demonstrated by his restitution); *United States v. Hairston,* 96 F.3d 102, 108 (4th Cir. 1996) (holding that "restitution, although taken into account in the guideline permitting a reduction for acceptance of responsibility, can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or 'usual'" (citation omitted)); *United States v. DeMonte,* 25 F.3d 343, 346 (6th Cir. 1994) (stating that "we have acknowledged that restitutionary payments may constitute 'exceptional circumstances' that justify a downward departure" (citing *United States v. Brewer,* 899 F.2d 503, 509 (6th Cir. 1990)); *United States v. Bean,* 18 F.3d 1367, 1369 (7th Cir. 1994) ("Undoubtedly there are circumstances that would justify using § 5K2.0 to [depart downward on the basis of restitution] beyond [the] two levels [of reduction provided by § 3E1.1]."); *United States v. Oligmueller,* 198 F.3d 669, 672 (8th Cir. 1999) (affirming a district court's downward departure on the basis of extraordinary restitution because "[w]e have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution" (citing *United States v. Garlich,* 951 F.2d 161, 163 (8th Cir. 1991)); *United States v. Miller,* 991 F.2d 552, 553–54 (9th Cir. 1993) (holding that district courts may depart downward on the basis of restitution when it (1) "shows acceptance of responsibility," (2) "was substantially greater than that contemplated by the Commission when drafting section 3E1.1," and (3) "the magnitude of the departure [is] commensurate with the level of the defendant's acceptance of responsibility").

(Footnote omitted).

[6] *See* United States Sentencing Commission, Results of Survey of United States District Judges January 2010 through March 2010, tbl. 13 (2010), [hereinafter USSC Survey of Judges] *available at* http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf (last visited March 14, 2022).

factors courts generally consider in deciding whether to apply a downward departure on this ground are "the degree of voluntariness, the efforts to which a defendant went to make restitution, the percentage of funds restored, the timing of the restitution, and whether the defendant's motive demonstrates sincere remorse and acceptance of responsibility." *See Kim*, 364 F.3d at 1244. For multiple reasons, Dr. Rosen's efforts to pay restitution in this case meet the "extraordinary" threshold and should result in a downward variance from the advisory Guideline range.

Dr. Rosen only received a small portion of the ill-gotten gains, the vast majority of which went to Doctor 1 and Mr. Abdalla. Dr. Rosen received approximately $100,000 in kickbacks from Mr. Abdalla and $52,839 from health benefit programs who paid Dr. Rosen as an out-of-network provider. Despite this, Dr. Rosen has agreed to repay the full restitution amount. *See Kim*, 364 F.3d at 1245 (finding restitution extraordinary even when paid on the sentencing date). Consequently, Dr. Rosen is paying restitution from his untainted life savings. As described above, Dr. Rosen has other significant financial responsibilities related to the care of his wife and two of his daughters. This is precisely the sort of fact pattern that warrants a variance for extraordinary restitution. *See Kim*, 364 F.3d at 1238 (finding significant that the defendants paid back the entire loss when they "benefitted from only about two-thirds" of the loss amount). As in *Kim*, "the fact [that Dr. Rosen] made and carried out his commitment to pay back money he never received simply demonstrates his extraordinary remorse." *Id.*

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Dr. Rosen acknowledges that he must suffer the consequences of his conduct. But Dr. Rosen's extraordinary efforts to make restitution in advance of sentencing, and in an amount significantly higher than the amount he personally received from the offense, show sincere remorse

15

for his conduct, and will have made the victims completely whole. Given the full restitution and the vital role Dr. Rosen plays in the lives of his wife and daughters, and his own age and health condition, we submit that a sentence of home confinement is sufficient, but not greater than necessary.

### D. Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Future Crimes of the Defendant

The public does not require any further protection from Dr. Rosen nor is there reason to believe he will reoffend. The crimes for which he was found guilty were made possible through his work as an ob-gyn. He has since left his practice and will lose his license upon sentencing. Moreover, there is no indication that Dr. Rosen has engaged in any criminal behavior apart from the charged conduct. Dr. Rosen also appears to be a low risk to reoffend based on available objective empirical evidence. According to the United States Sentencing Commission, a male Criminal History Category I offender over the age of 50, like Dr. Rosen, has a historical general recidivism rate of 6.2%, which is *the lowest reported recidivist rate* in the Commission's study.[7] The general recidivist rates coupled with Dr. Rosen's history and personal characteristics leave little doubt that he will not reoffend and strongly militate in favor of the requested sentence.[8]

---

[7] *See* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 28 Ex. 9 (2004) (listing the recidivism rates for various types of offenders and considering demographics such as gender, age, race, drug use, marital status, etc.), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

[8] *See United States v. Huckins*, 529 F.3d 1312, 1318-19 (10th Cir. 2008) (a district court "may weigh a defendant's lack of a criminal record" in deciding whether to grant a downward variance from the advisory Guidelines range "even when the defendant has been placed into a criminal history category of I"); *United States v. Smith,* 2008 WL 1816564 *4 (4th Cir. 2008) (affirming downward variance based in part on the defendant's "exemplary life" and lack of a criminal history); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming

Although general deterrence remains a required consideration under § 3553(a), there is little evidence to support a finding that harsh sentences deter future criminal conduct.  The unique combination of motivation and circumstance that lead otherwise law-abiding citizens to risk prosecution and imprisonment are not so easily overcome by the simple imposition of lengthy sentences.  While such a theory might be appealing on its face, the reality is that there is little to no difference in the deterrent effect between probation and imprisonment.[9]  Indeed, available research suggests that the *certainty* of being caught and punished carries for greater deterrent effect than the *severity* of the punishment.[10]  Moreover, there is a moral limit on the extent to which the need for general deterrence can or should be heaped on the shoulders of one person.[11]

---

below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

[9] *See* Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 PRISON J. 48S, 50S-51S (2011) (according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions"); *see also* Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

[10] S*ee also* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 CRIMINOLOGY 587 (1995); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent."), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposiumI/cPlenaryI.pdf.

[11] *See United States v. Meyers*, 353 F. Supp. 2d 1026, 1029 n. 1 (S.D. Iowa 2005) ("…the weight of society's need to send a message to potential wrongdoers can only be borne to a limited extent

### E.  Policy Statements/Considerations

This Court should give less weight to the advisory Guideline range because the dramatic 14-level enhancement, based simply on the amount of loss, is not supported by empirical evidence. When a Guideline range is not the product of "empirical data and national experience," courts have the discretion to conclude that the recommended sentence fails to achieve the purposes of federal sentencing under 18 U.S.C. § 3553(a), even in "mine-run" cases.[12]  Courts have criticized the role that the Guidelines play in increased incarceration rates through the overly formulaic and loss motivated enhancements that attend to crimes with financial gains or losses.  The increase in the Guidelines range that derives from the loss table at U.S.S.G. § 2B1.1(b)(1) results in unjustifiable sentencing ranges.[13]  *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn on this single factor [loss or gain], the Sentencing Commission

---

by one individual."); *see also* Paul H. Robinson, Distributive Principles of Criminal Law, at 223 (2008) (noting potential ethical objection to overemphasis on general deterrence, which "relies on treating the person being punished as a mere instrument by which to influence the conduct of others").

[12] *See Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007); *see also United States v. Nolasco-Ramirez*, 391 F. App'x 309, 311 (4th Cir. 2010) (finding that courts are "free to consider policy decisions behind the Guidelines, including the presence or absence of empirical data…."); *see generally United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("We recognize that in the post-*Booker* sentencing world, district courts must give due consideration to relevant policy statements, but those policy statements are no more binding than any other part of the Guidelines. Accordingly, district courts may 'vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines.'" (quoting *Kimbrough*, 552 U.S. 85 at 101).

[13] In the words of one district judge: "The Sentencing Commission to this day has never been able to articulate why it has two points for this, or four points for that.  These are just numbers. And yet once they are placed the whole thing is blessed and said to be rational."  *See* http://www.mainjustice.com/justanticorruption/2013/03/11/rakoff-scrap-dangerous-sentencing-guidelines/.

ignored [§ 3553(a)] and…effectively guaranteed that many such sentences would be irrational on their face.").[14]

Specific to Dr. Rosen, application of the § 2B1.1(b)(1) loss amount increases his Guidelines range by 14 levels.  *See* § 2B1.1(b)(1)(H) (adding 14 levels if the loss was more than $550,000 but no greater than $1,500,000).  Importantly, loss amount *alone* increases Dr. Rosen's advisory Guidelines range from probation (Level 6; 0-6 months) to 30-37 months (Level 19).

Also lost in the Guidelines analysis is Congress's original directive to the Sentencing Commission to "insure that the guidelines reflect *the general appropriateness of imposing a sentence other than imprisonment* in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…."  *See* 28 U.S.C. § 994(j) (emphasis added).  Whatever may be said of the Sentencing Commission and the noble aims of the Guidelines themselves, their enactment and continued role in the sentencing process, has not abided by Congress's direction.  Indeed, the percentage of federal defendants sentenced to straight probation declined dramatically from *48% in 1984 to 7.7% in 2007*.  *See* U.S.S.C., 2007

---

[14] *See also United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006) (lamenting the advisory guideline range in a fraud case that revealed "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); *see also United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (stating that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *see also United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("The guidelines provisions for theft and fraud place excessive weight on this single factor [loss/gain], attempting – no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes – to assign precise weights to the theft of different dollar amounts. In many cases, including this one, the amount stolen is a relative weak indicator of the moral seriousness of the offense or the need for deterrence.").

Sourcebook to Federal Sentencing Statistics, Fig. D.[15]   Moreover, the length of prison sentences has almost tripled.[16]

### F.  The Need to Avoid Unwarranted Sentencing Disparity

A sentence of home confinement would not create unwarranted disparity with the 48-month sentence imposed on Mr. Abdalla.  To begin with, Mr. Abdalla was the mastermind behind several different conspiracies that involved several different schemes and participants, only one of which ensnared Dr. Rosen.  Moreover, Mr. Abdalla and his co-conspirators billed for prescriptions that not only were unnecessary in some schemes, but also billed insurance companies for medications that had never even been prescribed or authorized in the first place.  Indeed, Mr. Abdalla's fraudulent conduct was so extensive that the probation office calculated the loss attributable to him to be in excess of $19,000,000[17] and Mr. Abdalla agreed to a forfeiture order that provided that he *personally* obtained at least $2,354,803.90 in proceeds.  And, unlike Dr. Rosen, Mr. Abdalla does not appear to have contributed one penny towards his restitution or forfeiture obligations, let alone fully satisfied them.  Finally, Dr. Rosen's personal history and characteristics, including his long record of good deeds and substantial contributions to the practice of medicine, in addition to his vital caretaking responsibilities, warrant a different type of sentence than that imposed on Mr. Abdalla.

---

[15] *Available at* http://www.ussc.gov/research-and-publications/annual-reports-sourcebooks/2007/sourcebook-2007.

[16] *See* Frank O. Bowman, III, *The Failure of the Federal Sentencing Guidelines: A Structural Analysis*, 105 Colum. L. Rev. 1315, 1328 n. 65 (2005) ("From 1984 to 1990, the mean sentence imposed by judges for all federal crimes increased from 24 months to 46 months….By 1993, the mean sentence imposed increased by almost another fifty percent to 66.9 months.") a*vailable at* http://scholarship.law.missouri.edu/cgi/viewcontent.cgi?article=1054&context=facpubs.

[17] The government and Mr. Abdalla agreed to recommend a loss amount of $6,216,434.39, which the Court accepted in calculating the Guidelines.

**CONCLUSION**

For the foregoing reasons and any other that may appear to the Court or that may develop at the sentencing hearing, Dr. Rosen asks this Court to sentence him to a term of probation with a period of home confinement.

Respectfully submitted,

LEONARD ROSEN,
By Counsel

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
*Attorney for Leonard Rosen*
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, NW
Suite 500 West
Washington, DC  20004
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177
ssears@schertlerlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of March, 2022, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.


/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
*Attorney for Leonard Rosen*
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, NW
Suite 500 West
Washington, DC  20004
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177
ssears@schertlerlaw.com